## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **KNOX ENERGY, LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:12CV00046 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **GASCO DRILLING, INC.,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendant. | ) | |

*Guy M. Harbert, III, J. Scott Sexton, H. David Gibson, Michael J. Finney, Abigail E. Murchison, and Scott A. Stephenson, Gentry Locke Rakes & Moore, LLP, Roanoke, Virginia, for Plaintiff and Counterclaim Defendants; Daniel G. Bird, Kellogg, Hansen, Todd, Figel & Frederick, PLLC, Washington, D.C., and Thomas R. Scott, Jr., Benjamin A. Street, and Jason D. Gallagher, Street Law Firm, LLP, Grundy, Virginia, for Defendant and Counterclaim Plaintiff.*

In this breach of contract action arising under Virginia law, a jury found for the plaintiff and counterclaim defendants, Knox Energy, LLC and Consol Energy, Inc., on the ground that there was no mutual assent to enter into the alleged contract. The defendant and counterclaim plaintiff, Gasco Drilling, Inc., has moved for a new trial pursuant to Rules 59(a) and 60(b)(3) of the Federal Rules of Civil Procedure. For the reasons that follow, I will deny the Motion for New Trial.

I. PROCEDURAL HISTORY.

Knox Energy, LLC ("Knox"), a natural gas producer, filed this action seeking a declaratory judgment that no contractual relationship existed between it

and Gasco Drilling, Inc. ("Gasco"), a gas drilling company.  Gasco in turn filed a Counterclaim against both Knox and an additional party, Consol Energy, Inc. ("Consol").[1]  In its Counterclaim, Gasco sought recovery of more than $14 million under an expired drilling contract that Gasco claimed had been resurrected by a form addendum that Consol sent to Gasco.  Without objection, I ruled prior to trial that Gasco would be treated as a plaintiff and had the burden of proof as to the existence of an enforceable contract.

This case was first tried in September 2014.  At that trial, at the close of Gasco's case-in-chief, I granted judgment as a matter of law pursuant to Rule 50(a) in favor of Knox/Consol.  *Knox Energy, LLC v. Gasco Drilling, Inc.*, 54 F. Supp. 3d 489, 501 (W.D. Va. 2014) (holding that no reasonable jury could find that there was mutual assent to the alleged contract).  On appeal by Gasco, the court of appeals reversed, finding that, "[g]iven this mix in the evidence . . . without weighing the evidence or making credibility determinations," the issue of mutual assent to the alleged contract was a matter for the jury.  *Knox Energy, LLC v. Gasco Drilling, Inc.*, 637 F. App'x 735, 739 (4th Cir. 2016) (unpublished).

---

[1]  Knox is a subsidiary of Consol.  For the purposes of this case, the parties have not distinguished between these two entities.  I will reference them jointly as "Knox/Consol" in this opinion.   The parties stipulated prior to the first trial in this case that Consol had actual authority to enter into drilling contracts on behalf of Knox during the relevant time period (ECF No. 123), although there was no stipulation that Consol was liable for contracts made by Knox.  In any event, there has been no contention that Consol and Knox are to be treated differently in this case.

In its opinion, the court of appeals recited the basic facts as follows:

In 2008, Consol, a natural gas producer, and Gasco, a drilling company, entered into a drilling agreement that lasted for two years, or until Gasco completed its work. Under the contract, Consol agreed to pay a "standby" rate of $10,800 per day, per drilling rig, for time when Gasco was on site but not actively drilling. While drilling, Gasco received an even higher fee. Additionally, the 2008 agreement contained a special "take-or-pay" provision, which guaranteed that Gasco would make two rigs available for Consol whenever it requested work. Whether or not Gasco was on site, it provided that Consol would pay the standby rate for 328 days of each twelve-month period. In May 2010, the parties amended the agreement to release one of the rigs from the contract. The remaining rig completed its work, and the contract terminated, in July 2010.

The essential dispute in this case is whether Gasco and Consol reinstated that 2008 contract in 2011. On June 6, 2011, Consol emailed Gasco a document titled "Addendum to Contract Purchase Order." Clyde Ratliff, Gasco's CEO, signed the Addendum and returned it on June 14, 2011. Consol returned the countersigned Addendum to Gasco on July 29, 2011. The Addendum stated that Gasco and Consol "agree to modify the 'term' provision of the contract purchase order to read as follows:" that the new "term of this agreement shall be for one year from the date set forth above and shall be automatically extended for one year terms unless either party gives written notice" of termination at least thirty days before renewal. The Addendum was "effective" on June 13, 2011. The "contract purchase order" referenced in the Addendum was the 2008 drilling agreement, "PO No. 5600000439."

. . . .

For a year after signing this Addendum, Consol did not ask Gasco to drill, and neither party communicated about the Addendum. Then, in June 2012, Gasco sent Consol a $7,084,800 bill for 328 days of take-or-pay standby charges. Contending that it had mistakenly signed the Addendum, Consol refused to pay. Additionally, Consol filed this diversity action for declaratory relief. In response, Gasco

sent Consol a second $7,084,800 invoice as liquidated damages for
early termination, and counter-sued for breach of contract.

*Id.* at 736-37. The court of appeals held that "[i]f Gasco knew or should have
known that Consol made a mistake, we agree there was no mutual assent. But
Gasco presented sufficient evidence that, if credited, a reasonable jury could have
found in its favor." *Id.* at 738.

The court of appeals affirmed several rulings I had made prior to the first
trial. *Id.* at 739-40. These included my ruling, based on an addendum dated May
10, 2012, that Gasco's potential recovery was limited to standby charges associated
with only one drilling rig. Op. & Order, Sept. 4, 2014, ECF No. 236. I had also
declined to exclude parol evidence of Knox/Consol's mistake, which Gasco argued
was irrelevant, confusing, and misleading. In affirming that ruling, the court of
appeals found that "Consol had to present some evidence of a mistake in order to
prove that its mistake was obvious to Gasco." 637 F. App'x at 740. The court of
appeals further noted that "both parties proposed essentially the same jury
instructions, that '[i]f a person's words or actions warrant a reasonable person in
believing that he intended real agreement, his contrary, but unexpressed, state of
mind is immaterial.' Thus the jury would have been instructed that its decision on
mutual assent must rest on the objective circumstances." *Id.*

After the second trial in this case, the jury found for Knox/Consol. The first
question on the special verdict form read,

1. Has Gasco proved by a preponderance of the evidence that Gasco and Consol had a meeting of the minds — mutual assent — such that the expired 2008 drilling contract was reinstated by the Addendum, with a distinct and common intent and understanding by both parties as to all of its material terms?

Verdict Form, ECF No. 409. The jury checked "No" and, in accordance with the form's instructions, did not answer the remaining questions.

## II. TRIAL EVIDENCE.

The following is a summary of the evidence presented at the second trial.

In 2011, Clyde Beaver "Ben" Ratliff was the president and part owner of Gasco. Ben Ratliff's brother, Jerry Ratliff, and Ben's two sons, Chris and Brian Ratliff, were also part owners of the company. In early 2008, at its peak, Gasco employed about 180 people.

Using an International Association of Drilling Contractors ("IADC") contract form titled "Drilling Bid Proposal and Daywork Drilling Contract – U.S.," Knox/Consol and Gasco entered into a drilling contract effective January 10, 2008. The contract covered natural gas horizontal wells in eastern Tennessee in the first quarter of 2008. A daywork drilling contract is different from a footage drilling contract, which the parties would have used for drilling vertical wells. The day rate stated in the January 2008 contract was $10,800 per day without drill pipe and $11,800 per day with drill pipe. The January 2008 contract also stated a standby rate of $10,800 per day. The standby rate was to be paid even when Gasco was not

performing any drilling. In the "Special Provisions" section of the contract form, the parties had stated certain additional terms, including that the vertical part of the well would be drilled at a footage rate of $21.50 per foot.

The January 2008 contract had a term of one year, but the parties cancelled that contract before its term ended. In June 2008, Knox/Consol and Gasco entered into a take-or-pay contract because Knox/Consol wanted a guarantee that rigs would be available to drill anytime they were needed. "Take-or-pay" means that Knox/Consol agreed to pay Gasco to have rigs and personnel ready to drill for a specified number of days per year, regardless of whether any drilling actually took place. This new 2008 take-or-pay contract ("2008 Drilling Contract") differed from the January 2008 contract it superseded in that the earlier contract did not entitle Gasco to any payment prior to when it was called to mobilize its equipment and go to the well site. The take-or-pay provision benefitted Gasco by guaranteeing that Gasco would receive payment for a specified number of days, but it disadvantaged Gasco by preventing it from using the dedicated rigs to perform other drilling work at higher rates.

The 2008 Drilling Contract used the same IADC form that the parties had used for the earlier contract. The take-or-pay provision, written into the Special Provisions part of the form, reads:

> Operator shall pay for 328 days per 12-month period, at the following rates per day, per rig:

$ 13,500.00/ with pipe

$ 12,000.00/ without pipe

$ 10,800.00/ standby

Contractor must have rig available to work or these rates will be adjusted for days rig is not available to work. The days that rig is drilling top hole on Footage Rate will be deducted from the 328 day total.

Gasco Trial Ex. 2 at 6, ECF No. 387-2.

The 2008 Drilling Contract covered a larger geographical area than the earlier contract — eastern Tennessee, eastern Kentucky, Virginia, and southern West Virginia. Gasco drilled about five wells under the January 2008 contract, and about eight additional wells under the 2008 Drilling Contract during the rest of 2008.

In February 2009, Knox/Consol and Gasco amended the 2008 Drilling Contract to reduce the standby rate from $10,800 per day per rig to $6,800 per day per rig. Gasco received nothing in exchange for reducing the rate. The amendment provided that when drilling recommenced, the standby rate would increase to $10,800. Gasco resumed drilling in September 2009, but Ben Ratliff did not begin charging the higher standby rate because he forgot about the rate increase. Knox/Consol did not notify Gasco of the billing mistake and has never offered to pay the uncharged amounts.

Gasco and Knox/Consol amended the 2008 Drilling Contract again in May 2009 to reduce the day rate from $12,500 to $11,500. The parties also changed the footage rate from $22.50 to $20.50. Gasco did not receive any consideration in exchange for reducing these rates. In May 2010, while the 2008 Drilling Contract was still in effect, the parties again amended the contract to require one of the drilling rigs to continue drilling until the five listed wells were completed, which occurred in August 2010. This May 2010 amendment had the effect of extending the term of the 2008 Drilling Contract for a little more than one month. Gasco did not submit a bid for this contract extension. The amendment also released the other drilling rig from the contract after the completion of a specified well, meaning that Knox/Consol would no longer have to pay the standby rate for that rig.

While the 2008 Drilling Contract was in effect, Ben Ratliff prepared an invoice after Gasco finished drilling each well. His secretary would then contact Knox/Consol to obtain a purchase order number for the invoice. Knox/Consol sent a different purchase order number for each invoice, along with a lengthy list of terms and conditions that Ben Ratliff was required to sign before Knox/Consol would pay the invoice. All of the seventeen invoices Gasco issued under the 2008 Drilling Contract contained a unique purchase order number.

In February 2009, Randy Albert and Kent Wright of Knox/Consol instructed Gasco to submit invoices monthly. Ben Ratliff testified that Gasco's normal practice was to bill for standby time at the end of the year and deduct any days in which the rigs had been used for drilling. In accordance with the instruction from Albert and Wright, Gasco submitted monthly invoices under the 2008 Drilling Contract.

In late 2010, Knox/Consol invited Gasco to submit a bid for drilling in 2011. The person who sent the bid request, and the person to whom Gasco submitted a bid, was Cecil Sagraves, Contract Sourcing Specialist for Consol. The contract form that Knox/Consol sent to Gasco when soliciting the bid indicated that the contract would cover eastern Tennessee and eastern Kentucky. The bid solicitation sought bids on a footage basis. Knox/Consol instructed bidders to bid the project based on using a three-person crew, whereas the 2008 Drilling Contract had provided for a four-person crew. Knox/Consol also indicated that the new contract would not provide for a standby rate.

Gasco submitted two bid proposals. In the first, Gasco proposed day rates of $11,800 without pipe and $12,300 with pipe, as well as a footage rate, for a four-person crew. The $12,300 day rate was $200 less than the modified day rate under the just-completed 2008 Drilling Contract. Gasco's first proposed bid also included a standby rate of $10,800, despite Knox/Consol's indication that this

contract would not include a standby rate. Gasco's second proposal stated day rates of $12,500 without pipe and $12,850 with pipe; the size of the crew was not specified. The second proposal again included a standby rate of $10,800. In its second proposal, Gasco stated that the term would be one year from January 2011 with no extensions or renewals. The proposal did not include an early termination penalty, nor did it include any take-or-pay provision. Ben Ratliff testified that because Knox/Consol did not request a take-or-pay provision, he knew he would likely be wasting his time by including one in the proposal, given the state of the natural gas market at the time.

Gasco did not win the contract for 2011 drilling; the contract was instead awarded to Noah Horn Well Drilling ("Noah Horn"), one of Gasco's competitors. Gasco learned from Sagraves that the contract had been awarded to Noah Horn. In early 2011, Ben Ratliff heard a rumor that the Noah Horn rig that was performing drilling for Knox/Consol was experiencing mechanical problems.

On June 6, 2011, Gasco received an email from Janet Fahrenhold at Knox/Consol with an attachment titled Addendum to Contract Purchase Order ("Addendum"). The email stated:

> Attached is a [sic] Addendum to your current Contract Purchase Order No. 5600000439. The purpose of the Addendum is to revise the Term of the Contract Purchase Order to have it extend automatically from year to year unless either party gives the other party notice of intent not to extend at least thirty days before the end of the current one year term.

Also, because of changes in our SAP system we have to renumber our existing contracts.  Please be advised that the number of your contract has been changed from 4600000856 to 5600000439

Please sign and return the attached addendums via email within 2 business days.

Gasco Trial Ex. 7 at 1, ECF No. 387-7.  The attached form read as follows:

## Addendum to Contract Purchase Order

This Addendum to contract purchase order ("Addendum") is entered into effective this ___ day of _____, 20___, by and between Consol Energy, Inc. and its affiliates ("Company") and _____ ("Contractor").

Whereas, Company and Contractor are parties to a contract purchase order (PO No. _____) (the "Contract Purchase Order"); and

Whereas, Company and Contractor agree to modify the "Term" provision of the Contract Purchase Order as provided herein.

Therefore, intending to be legally bound, Company and Contractor agree as follows.

1. Company and Contractor agree to modify the "Term" provision of the Contract Purchase Order to read as follows:

**Term:**

Subject to Company's right to cancel this contract purchase order as set forth below, the term of this agreement shall be for one year from the date set forth above and shall be automatically extended for one year terms unless either party gives written notice to the other party of the termination of the agreement at least thirty (30) days before the end of the current one year term.

2. Except for the modification of the "Term" provision as set forth in paragraph 1 of this Addendum, all other provisions of the Contract Purchase Order shall remain in full force and effect.

In witness whereof, the parties have caused their duly authorized representatives to execute this agreement intending it to be effective on the effective date.

*Id.* at 2.

Gasco's office manager, Freda Rasnake, called Ben Ratliff to tell him about the email. Ben Ratliff testified that he did not understand the email, so he instructed Rasnake to respond to the email and request from Knox/Consol a copy of the contract to which the Addendum would apply. That afternoon, Rasnake wrote to Fahrenhold, "We have reviewed your email with the attached Addendum. Can you please forward a copy of Contract #4600000856." Gasco Trial Ex. 8, ECF No. 387-8. Ben Ratliff did not know Fahrenhold.

When Rasnake did not receive a response from Fahrenhold, she emailed again two days later to ask for the contract a second time. That day, Rasnake received an email from Erin Bywaters of Knox/Consol. The subject line of the email read, "FW: Contract 5600000439 – copy of contract," and the body of the email stated:

We would like to draw your attention to the attached contract: 5600000439 From ECC Contract: 4600000856.

Please contact Sourcing Specialist for questions related to the referenced contract.

Best regards,

Todd Shumaker
724-485-4349

Gasco Trial Ex. 10 at 1, ECF No. 387-10. Attached to this email was the 2008 Drilling Contract and several related documents. The email identified Bywaters as a member of the Material and Supply Chain Management department. Ben Ratliff had seen Bywaters' name previously on a purchase order email sent by Knox/Consol. He testified that in 2009, Rex Cooper of Knox/Consol had told him that because of some restructuring, communications would be coming from the Material and Supply Chain Management department. A letter and email sent by Knox/Consol in February 2009 also indicated that the company was making certain changes in how it did business with suppliers and moving toward electronic procurement. Ben Ratliff testified that when he received the email from Fahrenhold with the 2008 Drilling Contract attached, it was clear to him that Knox/Consol wanted to reinstate that contract.

Shortly after receiving the email from Bywaters, Rasnake received an email from Fahrenhold, which appears to have been a forwarded copy of the same email Bywaters had sent to Rasnake, with the original attachments plus an electronic commerce agreement and the Addendum form. Ben Ratliff was out of the office at the time Rasnake received these emails, but when he returned to the office a few days later, he received a paper copy of a lengthy list of terms and conditions from Knox/Consol. Todd Shumaker was identified in the terms and conditions

document, which referred to him as General Manager, Contract and Project Management for Knox/Consol.

One of the attachments to the emails from Bywaters and Fahrenhold referencing the 2008 Drilling Contract listed a validity start date of January 22, 2010. Ben Ratliff testified that he thought Knox/Consol wanted to backdate the reinstated contract to that date, which made him uncomfortable. He knew that if he backdated the document to January, he would already be entitled to a significant amount of standby time. The same attachment listed an end date of December 31, 9999. He understood the purpose to be to renew the contract for a one-year term with automatic renewal each year until termination notice was given.

Ben Ratliff testified that it was not his usual practice to consult an attorney about drilling contracts unless he had a question or was uncomfortable about something. He met with attorney Randy Bolling regarding the Addendum on June 13, 2011.

He ultimately "made the decision to use the current date that [he] signed the contract," filled in the blanks on the form, and executed the Addendum on June 13, 2011, the same day that he first met with Bolling. Trial Tr., Dec. 13, 2016, at 31, ECF No. 421. He signed the Addendum three days after he signed the accompanying electronic commerce agreement, but he could not explain why he had waited to sign the Addendum. He instructed Rasnake to email the signed

Addendum to Knox/Consol, which she did on June 14, 2011. In the email, at Ben Ratliff's instruction, Rasnake typed, "Gasco is standing by and ready to perform work under this agreement at Consol's call." Gasco Trial Ex. 12 at 1, ECF No. 397-5. The email did not mention drilling. Ben Ratliff testified that when he signed the Addendum, he believed "that I was committing myself to having two rigs, according to this contract, ready at their call." Trial Tr., Dec. 13, 2016, at 34, ECF No. 421.

On July 27, 2011, Fahrenhold sent an email to Rasnake requesting information about which personnel handled certain types of matters for Gasco. Two days later, on July 29, 2011, Fahrenhold sent an email to Rasnake with the subject line "100679 Gasco Drilling – Daywork Reference Only." Gasco Trial Ex. 15 at 1, ECF No. 397-1. The body of the email read, "Please see the attached copies of the fully executed addendum and eCommerce forms. Thanks for your cooperation with this matter." *Id.* Attached to the email were the Agreement to Engage in Electronic Commerce and the Addendum, both signed by Shumaker.

Ben Ratliff testified that in light of the Addendum, Gasco renewed a lease for an equipment yard in Tennessee and retained certain employees to perform drilling work. He testified that he had no reason to believe Shumaker would not have read the Addendum, reviewed the 2008 Drilling Contract, or intended to sign the Addendum.

One year after he executed the Addendum, on June 13, 2012, Ben Ratliff caused an invoice to be issued to Knox/Consol for standby charges totaling $7,084,800, representing 328 days at a day rate of $10,800 per rig for two rigs. He testified that after Knox/Consol received the invoice, Shumaker called his cell phone and left a message asking for a return call. Ben Ratliff called Shumaker, but Shumaker did not answer. According to Shumaker, Ryan Litwinovich called Ben Ratliff's cell phone and then called Gasco's office and left a message, but he never received a return phone call. Shumaker then called and left a message for Ben Ratliff. Several days after Knox/Consol received the invoice, Ben Ratliff received a letter from an attorney representing Knox/Consol that denied the existence of a contract and claimed that there had been a mistake. Bolling, Gasco's attorney, wrote a letter in response, and Knox/Consol's in-house counsel replied. The reply letter read, in part:

> Through clerical error by a temporary employee in the Material and Supply Chain Management Department at Consol Energy, a notice was sent months [after the 2008 Drilling Contract terminated] to Gasco regarding an addendum that was being added to Consol's Contract Purchase Orders (not drilling contracts) in order to allow these existing contracts to extend from year to year. There is no doubt that Gasco was on notice that the forms sent to it were a mistake and were not intended to resurrect the terminated 2008 Drilling Contract.
> . . . .
>
> There is not now nor was there ever a meeting of the minds about extending the terms of the July 7, 2008 IADC Daywork Drilling Contract. Knox (and its parent and affiliate companies) expressly deny any current contractual arrangement with Gasco as well as any

such arrangement since July/August of 2010 when the July 7, 2008 IADC Daywork Drilling Contract terminated.

Gasco Trial Ex. 21 at 1-2, ECF No. 397-9. The letter went on to state that to the extent there existed "any contractual arrangement whatsoever" between the parties, "that arrangement is hereby terminated." *Id.* at 2. The address to which the letter was sent was the notice address listed in the 2008 Drilling Contract.

The 2008 Drilling Contract contained an early termination provision that required payment of a full year's worth of standby time if Knox/Consol terminated the contract before the end of a current term. Ben Ratliff responded to the letter from Knox/Consol's counsel by sending an invoice for standby charges for a second year.

The 2008 Drilling contract, the amendments thereto, and the earlier January 2008 contract had all been negotiated by Randy Albert or Kent Wright on behalf of Knox/Consol. None of those agreements had been negotiated or executed by Shumaker.

Ben Ratliff had been in the gas drilling business for approximately 40 years, and he had only negotiated one other contract with a 328-day, take-or-pay provision. He executed that contract with a different natural gas producer, EXCO, in 2008, about 40 days after he executed the 2008 Drilling Contract. The other take-or-pay contracts he had negotiated in his career had contained 60- or 90-day take-or-pay provisions. Drilling under the EXCO contract was to begin in January

2009, but Gasco never drilled any wells under that contract because the price of natural gas dropped significantly between June 2008 and January 2009.

In January 2008, natural gas was priced at $7.38 per unit. In June 2008, natural gas was priced at $10.28 per unit. The price of gas reached record heights in June and July of 2008. By February 2009, the price of gas had fallen to $3.70 per unit. It was during that month that Albert and Wright approached Ben Ratliff to negotiate the first amendment to the 2008 Drilling Contract.

In March or April of 2009, Albert and Wright told Ben Ratliff that Gasco would have to put its rigs on standby for the foreseeable future. On May 6, 2009, Gasco sent Knox/Consol an invoice for one month's worth of standby charges for one rig under the 2008 Drilling Contract. One of the rigs drilled a well in September 2009. The rigs started drilling again in January 2010 and were steadily in use until the last well was drilled; thus, little standby time was incurred in 2010. In May 2010, Albert and Wright requested another amendment to the 2008 Drilling Contract because of the downturn in the natural gas market. In negotiating the amendment that released the second rig from the 2008 Drilling Contract, Gasco proposed language that would have allowed for the contract to be extended at the agreement of the parties, but Knox/Consol removed that language, and it did not become part of the executed agreement.

After Gasco sent Consol a final invoice in August 2010 and Knox/Consol paid the invoice, there was no relationship between Gasco and Knox/Consol during the remainder of 2010. On January 3, 2011, Chris Ratliff emailed Wright to ask whether it was true that Knox/Consol might need a few wells to be drilled in the south in the next year. Wright responded, "We only have two shallow conventional wells scheduled in SWV this year. I will give you a heads up when we get close to starting." Knox/Consol Trial Ex. 12, ECF No. 390-14. The next day, Chris emailed Rocky Malamisura of CNX Gas, another affiliate of Knox/Consol, and asked whether CNX had any drilling work for Gasco. Malamisura responded, "The contract for Va. is current & will not be bid out[.]" Knox/Consol Trial Ex. 13, ECF No. 390-15.

Ben Ratliff testified that when he received the initial email from Fahrenhold, he did not have a current contract with Knox/Consol. The email referred to the current one-year term, but when Gasco received the email, there was no current one-year term. The email also referred to existing contracts, but Gasco did not have any existing contracts with Knox/Consol at the time. Ben Ratliff testified that Knox/Consol had reused and renewed other expired contracts in the past.

The Terms and Conditions document that Knox/Consol sent to Gasco in connection with the Addendum stated that "Terms & Conditions Agreements apply only to non-bid work generally performed as time and material jobs."

Knox/Consol Trial Ex. 14 at 3, ECF No. 390-16. Another part of the document stated, "Terms and Conditions Agreements can be used for routine, regularly occurring services. Terms and Conditions Agreements cannot be used for any services or projects that have been competitively bid by the Site Supervisor and Contract Sourcing Specialist." *Id.* at 4. Ben Ratliff testified that he did not read the Terms and Conditions document because it was a long document and he thought it was the same document he had read on many previous occasions. He noted that Knox/Consol was not asking for a bid in the Addendum form, and drilling contracts are routine in the sense that Gasco had used the same IADC contract form for decades. Several purchase orders that Gasco had received in connection with work performed under the 2008 Drilling Contract in 2008 also contained Terms and Conditions sections.

Ben Ratliff testified that he believed the word "term" in the Addendum referred to the term provision in the 2008 Drilling Contract, and that the Addendum changed that provision. He understood that the "term" language set forth in the Addendum was to be substituted for the "term" paragraph of the original 2008 Drilling Contract. The 2008 Drilling Contract stated that the term was two years, "commencing on the date specified in paragraph 2 above." Knox/Consol Trial Ex. 2 at 2, ECF No. 390-1. The date specified in paragraph two

of the 2008 Drilling Contract was July 7, 2008. But he believed that Knox/Consol wanted to renew the term as of the date he signed the Addendum.

When Gasco received the initial email from Fahrenhold with the Addendum form attached, natural gas was selling for $4.20 per unit, down from $10.50 per unit in June 2008. As of June 1, 2011, 15 of Gasco's 16 operable drilling rigs were sitting idle. A substantial number of the rigs were idle for all of 2011. Each rig had cost Gasco millions of dollars. In June 2011, Gasco was not doing nearly as much business as it had been doing in June 2008, and its income had dropped precipitously. In 2008, Gasco had paid approximately $19,000,000 in dividends to its shareholders, Ben Ratliff, Ben Ratliff's brother, and Ben Ratliff's two sons. In contrast, in 2011 and 2012, Gasco operated at a loss of several hundred thousand dollars each year.

Gasco submitted no bids to any gas producers in 2010 that included take-or-pay provisions. The same was true for 2011, 2012, and 2013. Gasco knew that if it had included take-or-pay provisions in its bids during that time period, it would not have won the bids. Yet Ben Ratliff testified that he believed that Knox/Consol wanted to resurrect the take-or-pay 2008 Drilling Contract in 2011.

When Gasco received the signed Addendum back from Knox/Consol, the only Gasco representatives who knew about the Addendum were Ben Ratliff, Rasnake, and Bolling. The Vice President of Drilling, the Vice President of

Construction, the other shareholders, and the accountants were all unaware of the alleged contract. Ben Ratliff testified that this was typical of how he handled contracts; he only let the others know about a contract when they needed to take action related to the contract. For competitive reasons, he did not want many people to know the details of Gasco's contracts.

In late August of 2011, Ben Ratliff met with Litwinovich of Consol to discuss a possible bid for drilling in the Marcellus Shale in western Pennsylvania and northern West Virginia. Litwinovich's name had been on the documents Gasco had received regarding the Addendum. Gasco submitted a bid. The only rigs owned by Gasco that were capable of doing any Marcellus Shale drilling were the two Speedstar 185 rigs that Gasco stored in Tennessee, and to a lesser extent, Gasco's Speedstar 150 rigs. Ben Ratliff testified that the Speedstar 185 rigs were the rigs that would have performed the work under the allegedly revived 2008 Drilling Contract. He never suggested to Knox/Consol that those rigs, which were sitting idle in Tennessee and incurring standby charges, could be moved to the Marcellus Shale region to perform the drilling there, despite the fact that the day rates for the Marcellus Shale work were much higher than the day rates under the 2008 Drilling Contract.

Gasco added the following special provision to its Marcellus Shale bid:

> It is understood and agreed by and between the parties that this
> Contract pertains only to the proposed drilling services to be provided

by Contractor in drilling Top holes for the Marcellus Shale in Pennsylvania and West Virginia and nothing contained herein shall in any way alter, amend, change, limit, modify, terminate, replace or supplant any other prior, existing or future contracts as may be entered into by and between Operator and Contractor, all of which other contracts shall be binding and enforceable in accordance with their separate terms and conditions.

Knox/Gasco Trial Ex. 27 at 6, ECF No. 390-25. Ben Ratliff testified that he did not add this provision for the specific purpose of protecting the Addendum contract, but because drilling in the Marcellus Shale was so different from other drilling work Gasco had done for Knox/Consol, and he wanted to clearly separate the Marcellus Shale contract from other contracts. Though he testified that he may have added similar language to other contracts over the years, no other such contracts were offered into evidence. According to a list of attorney-client communications prepared and produced by Gasco, on the same day that Ben Ratliff signed the Marcellus Shale bid, he had a telephone conference with Bolling about the Addendum.[2]

Gasco did not win the Marcellus Shale drilling contract. Gasco lost $941,000 in 2011. Nevertheless, Gasco did not send Knox/Consol an invoice in 2011 for standby time under the 2008 Drilling Contract. Ben Ratliff testified that it

---

[2] In his trial testimony, Ben Ratliff testified that he did not recall having a conversation with Bolling that day and disputed the accuracy of the list of attorney-client communications. In response, Knox/Consol introduced into evidence a portion of Ben Ratliff's deposition testimony in which he stated that he had spoken with Bolling that day.

was his practice to send a bill at the end of the contract term, which is why he did not send monthly invoices to Knox/Consol and instead waited until a full year after signing the Addendum to send an invoice for standby time. The 2008 Drilling Contract stated that payment "shall be due, upon presentation of invoice therefor, . . . at the end of the month in which such work was performed or other charges are incurred, whichever shall first occur." Knox/Consol Trial Ex. 2 at 2, ECF No. 390-1. Ben Ratliff testified that he did not believe that provision required him to issue monthly invoices.

On January 3, 2012, Chris Ratliff emailed Doug Clark at Knox/Consol to "see if you are drilling any this year and if so when you plan on bidding it out." Knox/Consol Trial Ex. 28 at 1, ECF No. 390-26. Clark responded, "They tied our drilling to Virginia so we will be using Noah Horn, we have only 13 to drill this year." *Id.* Chris Ratliff still did not know about the Addendum. On the date of this email exchange, all of Gasco's rigs were idle.

When Gasco sent Knox/Consol an invoice for standby time under the allegedly revived 2008 Drilling Contract on June 13, 2012, according to Gasco, it was too late for Knox/Consol to give notice of nonrenewal for a second term. The invoice was the first communication between Knox/Consol and Gasco regarding the Addendum since it was executed a year earlier. Gasco did not call Knox/Consol to obtain a purchase order number before sending the invoice as it

had done in the past.  Instead, the invoice listed the contract number for the 2008

Drilling Contract rather than a purchase order number.

In its annual report to the Securities and Exchange Commission for the 2010

fiscal year, Knox/Consol wrote the following:

> Investment in our securities is subject to various risks, including risks and uncertainties inherent in our business.  The following sets forth factors related to our business, operations, financial position or future financial performance or cash flows which could cause an investment in our securities to decline and result in a loss.
>
> . . . .
>
> A decrease in the availability or increase in the costs of commodities, key services, or capital equipment used in mining or gas operations, such as steel, liquid fuels and rubber products we use in mining operations or drilling rigs we use to drill gas wells in our gas operations, could impact our cost of production and decrease our anticipated profitability.
>
> . . . .
>
> We attempt to mitigate the risks involved with increased industrial activity by entering into "take or pay" contracts with well service providers which commit them to provide services to us at specified levels and commit us to pay for services at specified levels even if we do not use those services.  However, these contracts expose us to economic risk.  For example, if the price of natural gas declines and it is not economical to drill and produce natural gas, we may have to pay for services that we did not use[.]  This would decrease our cash flow and raise our costs of production.

Gasco Trial Ex. 75B at 41, 47-48, ECF No. 390-38.

Todd Shumaker testified that he did not have authority to enter into drilling

contracts on behalf of Knox/Consol.  He explained that there were two sides of the

Knox/Consol business: the operational side, which has authority to spend money on services and equipment needed to produce coal and natural gas, and the supply chain side, which is the administrative side. The operational side would identify needs and request that the necessary materials, equipment, or services be procured by the supply chain side. The supply chain side has the authority to negotiate contracts and enter into purchase orders for the items and services requested by the operational side. To his knowledge, no representative of Knox/Consol informed Gasco of any limitation on Shumaker's authority or the internal procedures for contracting and procurement.

Shumaker testified that he stamped his signature on the Addendum after scanning it to ensure that all the blank spaces on the form had been completed. He explained that Fahrenhold was a temporary worker hired to work on a project that entailed "evergreening" Knox/Consol's contract purchase orders. Erin Bywaters was a clerical employee who worked directly for Shumaker. Fahrenhold worked in Shumaker's department, the Supply Chain department. She did not work for Shumaker; she worked for the Business Supply Process Group. Shumaker testified that Knox/Consol drafted the Addendum form to implement what he called an evergreen program. Knox/Consol had a number of contract purchase orders that were essentially rate sheets with no values included. The contract purchase orders had terms of one or two years and had to be renewed at the end of each term,

which became burdensome. Shumaker came up with the idea to amend all of those contract purchase orders to renew automatically to reduce the administrative burden. Once the parties to the contract purchase orders executed the Addendum form, each contract purchase order would automatically renew every year unless one of the parties gave notice at least 30 days before the end of the year that it did not wish to renew or wished to negotiate the applicable rates.

There were approximately 1,000 contract purchase orders that Knox/Consol sought to amend. Three temporary workers had the task of emailing vendors about the evergreening project. Fahrenhold was given a list of vendors to whom she was supposed to email the Addendum form. The number stated in Fahrenhold's emails to Rasnake was the number that identified the 2008 Drilling Contract. Rex Cooper had previously instructed Litwinovich to add IADC drilling contracts to Knox/Consol's computerized SAP system, which was used to issue boilerplate purchase orders. Though the drilling contracts were not the same as the boilerplate contracts, adding them to the SAP system allowed Knox/Consol to track invoicing and issue purchase orders against the drilling contracts. The 2008 Drilling Contract was intentionally added to the same SAP system that held the contract purchase orders some time before the commencement of the evergreening project. When lists of contracts were prepared from the SAP system for the evergreening project, Shumaker forgot that the SAP system contained the drilling contracts.

Shumaker testified that in Knox/Consol parlance, a terms and conditions contract and a contract purchase order are essentially the same thing. Both phrases refer to small value or noncommittal contracts, like rate sheet agreements. When Shumaker stamped his signature on the Addendum, he did not look up the contract purchase order number listed on the Addendum in the SAP system to see which contract purchase order was referenced. Shumaker did not instruct Fahrenhold or Bywaters to carefully read the referenced documents in the SAP system before sending the Addendum forms to vendors.

Shumaker explained that the Addendum form was intended to modify the term of an underlying contract purchase order by essentially replacing the term language in the original contract purchase order with the term language set forth in the Addendum. Therefore, from Knox/Consol's perspective, the Addendum's use of the phrase "date set forth above" referred not to the effective date in the preamble to the Addendum form, but rather to the effective date listed in the underlying contract purchase order that was to be amended by the Addendum form. Knox/Consol Trial Ex. 16, ECF No. 390-18. Shumaker testified that the Addendum form's use of the words "current" and "extended" and the phrase "shall remain in full force and effect" reflect the form's intended purpose of evergreening existing agreements rather than reviving an agreement that had already terminated. Likewise, the use of the words "current," "extend," and "existing" in Fahrenhold's

initial email to Rasnake were consistent with amending a contract that was in effect at that time.

Knox/Consol had a Terms & Conditions Agreement Policy whose summary stated, in relevant part:

- Terms and Conditions Agreements are solely for the purpose of contractually establishing the pricing, terms and conditions under which work is to be performed and to insure the contractors' compliance with all safety, insurance and regulatory requirements.

- A Terms and Conditions Agreement expedites the process for utilizing a contractor under certain conditions, but it does not bypass the requirement for a purchase order. A separate purchase order is still required for each service performed under a Terms and Conditions Agreement in order for the contractor to be able to bill for the work. Invoicing MUST comply with the pricing in the Terms and Conditions Agreement.

Knox/Consol Trial Ex. 14 at 2, ECF No. 390-16. The policy further stated that "Terms & Conditions Agreements apply only to non-bid work generally performed as time and material jobs." *Id.* at 3. Shumaker explained that time and material jobs are billed hourly and would cover things like water trucks. The policy also read, "Terms and Conditions Agreements can be used for routine, regularly occurring services. Terms and Conditions Agreements cannot be used for any services or projects that have been competitively bid by the Site Supervisor and Contract Sourcing Specialist." *Id.* at 4. Another section stated, "A purchase order must be issued for each specific job before any work can start and the contractor is required to reference this purchase order number on their invoices. This purchase

order number is needed in order for Accounts Payable to be able to pay the invoice." *Id.* Shumaker testified that this policy was sent to all of Knox/Consol's contractors, including Gasco.

Knox/Consol had inadvertently sent the Addendum form to several other drilling companies in addition to Gasco. None of those other drilling companies contended that their expired drilling contracts had been revived by the Addendum form or sought payment based on the Addendum form.

Brian Green was the General Manager of Knox from approximately May 2010 until November 2011. He reported to Randy Albert, who was Vice President of Emerging Business Unit for Consol. In his General Manager role, Green interacted with Gasco primarily through Chris Ratliff, who oversaw drilling. Green also communicated with Brian Ratliff regarding construction. Green spent time with Chris and Brian Ratliff socially as well. Green met with Ben Ratliff in person on two occasions to discuss issues surrounding drilling.

Green testified that on May 10, 2010, Gasco proposed an amendment to the 2008 Drilling Contract to remove one of its rigs from the contract. The amendment language Gasco proposed regarding the remaining rig included the sentence, "Contract can be extended if agreed to by both parties." Knox/Consol Trial Ex. 5 at 2, ECF No. 390-5. That proposed amendment language was not adopted by the parties.

Before Knox/Consol solicited bids for drilling in 2011, Green spoke with Chris Ratliff. On December 1, 2010, Sagraves sent a bid solicitation email to Chris Ratliff and representatives of five other drilling companies. Green was copied on the email, along with Clark and Litwinovich. Clark was Drilling Manager for Knox and Litwinovich was Manager of Supply Chain. Sagraves sent the drilling companies an IADC footage-based contract form. Knox/Consol completed some of the blanks in the form before sending it to the drilling companies to indicate certain elements it expected their bids to contain. The expectation was that the drilling companies would complete the remaining blanks on the form.

Green explained that a standby provision is different from a take-or-pay provision. Standby time is paid when a drilling rig has commenced work on a well and something outside the control of the drilling company causes a delay. On the IADC form that Knox/Consol sent to the drilling companies, it typed "N/A," meaning not applicable, into the blank for standby rate. Green testified that Knox/Consol did not intend to pay standby time under the 2011 drilling contract. Knox/Consol did not propose a take-or-pay provision for the 2011 contract because the natural gas market was down and rigs were readily available for drilling. Given the low gas prices in December 2010, it would not have been commercially reasonable for Knox/Consol to enter into a take-or-pay drilling contract at that time. Gasco submitted two bids for 2011, neither of which contained take-or-pay

provisions. Had those bids contained take-or-pay provisions, Green testified that Knox/Consol would not have considered them.

On December 30, 2010, Knox/Consol notified Gasco via email that the 2011 contract had been awarded to Noah Horn. Though Green continued to communicate with Chris and Brian Ratliff about other issues, Gasco did not mention the Addendum to Green or ask any questions regarding the allegedly resurrected 2008 Drilling Contract. Green testified that the bids Knox/Consol had received for the 2011 contract were more favorable to it than the 2008 Drilling Contract, so there would have been no reason for Knox/Consol to reinstate the 2008 Drilling Contract. Green testified that the 2010 quarterly investment report's mention of take-or-pay contracts likely referred to the Marcellus Shale or other geographic regions rather than the Knox area.

Antony Roop, a former accountant for Gasco, testified that it was unusual for him to be involved with invoicing, but he was aware of the invoice that Gasco issued to Knox/Consol based on the Addendum before Gasco sent it. He could not recall seeing another invoice for such a large amount during the ten years that he worked for Gasco. Roop participated in two in-person meetings with Bolling regarding the Addendum and received nine emails from Bolling about the Addendum. Bolling sent two emails to Roop on February 14, 2012. The first in-person meeting took place in May 2012 between Ben Ratliff, Bolling, and Roop.

On May 15, 2012, Roop emailed Berkley Keen, another accountant who worked for Gasco, and stated, "Attached is the contract, extension and emails we discussed today. Do you think we should setup a reminder for the annual billing on the standby rate?" Knox/Consol Trial Ex. 29, ECF No. 397-19. Roop testified that the email referred to the Addendum, and the reminder mentioned was the reminder to send what would be the June 13, 2012 invoice. Roop sent the email to Keen two days after the date on which notice of nonrenewal was allegedly required under the Addendum.

Roop agreed that it would have been possible for Gasco to send invoices under the Addendum monthly rather than waiting until the end of the first year-long term. He further admitted that based on the time value of money, it would have been more financially beneficial for Gasco to be paid in monthly increments. However, he explained that it is sometimes advantageous from a tax perspective to delay issuing an invoice.

Roop testified that although Gasco complied with Knox/Consol's request for monthly billing under the 2008 Drilling Contract, Gasco did not usually bill standby time monthly. He stated that he had no reason to believe that there was any problem with billing annually under the Addendum.

Randy Albert testified that footage drilling contracts are more favorable to a gas company like Knox/Consol than day rate contracts because a footage drilling

contract places the risk of delays on the drilling company rather than the gas company. He explained that take-or-pay contracts are very risky for gas companies and are typically used when rigs are in high demand. Albert testified that Knox/Consol tried to have its permits and title work ready twelve to eighteen months before drilling would occur, and there was a lengthy planning process before Knox/Consol decided to drill. Decisions to enter into drilling contracts were not made quickly or lightly.

Albert explained that between 2008 and 2010, natural gas drilling across the industry migrated from Tennessee, Kentucky, and Virginia up to the Marcellus Shale in Pennsylvania and West Virginia because drilling in that formation was much more productive and profitable. In 2007 and 2008, demand for drilling rigs in Tennessee, Kentucky, and Virginia was at an all-time high. By 2011, the supply of available rigs was high and the demand was low, in part because the kinds of rigs that had been used in Tennessee, Kentucky, and Virginia could only be used for vertical top hole drilling in the Marcellus Shale. After the rigs had reached a certain depth, larger rigs would be needed to do the horizontal drilling.

Albert testified that a drilling company might need to invest $20 million or more to make a rig available for drilling in the Marcellus Shale, which was ten to twenty times as much as it cost to make a rig like Gasco's available in the southern Appalachian region. Because of that substantial up-front cost to the drilling

companies, Knox/Consol sometimes felt it was necessary to enter into take-or-pay contracts in 2009 and 2010 for drilling in the Marcellus Shale.

Albert stated that over the decades that he had known Ben Ratliff, the two communicated often and through various channels, including face-to-face meetings and by telephone. Ben Ratliff also communicated frequently with several other Knox/Consol personnel about drilling contracts. Gasco's office is located approximately two miles from Knox/Consol's Virginia office.

Albert testified that when Gasco and Knox/Consol amended the 2008 Drilling Contract in May 2010 to release one of the rigs, Knox/Consol struck Gasco's proposed amendment language that would have allowed for extension of the contract upon agreement of both parties. Albert stated that he had asked Knox/Consol's in-house counsel to remove that provision because Knox/Consol was eager for the financially unfavorable take-or-pay contract to end at that point.

Noah Horn, which was awarded the 2011 drilling contract, had a newer, bigger rig than Gasco. The 2011 Noah Horn contract contemplated drilling approximately 20-25 wells, and Knox/Consol was not in a hurry to drill those wells. Albert indicated that when Gasco submitted its bids for the 2011 drilling contract, it did not mention to Knox/Consol that it believed it had two rigs standing by under the allegedly revived 2008 Drilling Contract. Albert testified that had Gasco mentioned those rigs, assuming that Albert found the contract was valid, he

would have put those rigs to work in the Marcellus Shale to avoid losing money. Regarding the clause in Gasco's bid stating that "nothing contained herein shall in any way alter, amend, change, limit, modify, terminate, replace or supplant any other prior, existing or future contracts," Knox/Consol Trial Ex. 27 at 6, ECF No. 390-25, Albert stated he had never seen that language in any other drilling contract. He further testified that he knew of no reason a drilling company would wait a year to issue an invoice, and he had not known other drilling companies to issue annual invoices. Albert stated that Knox/Consol had on occasion extended existing drilling contracts by mutual agreement without undergoing a competitive bidding process.

Knox/Consol did not tell Gasco or other drilling companies about its drilling commitments to landowners under gas leases. On April 30, 2010, Consol acquired Dominion Resources, which held approximately 1.46 million acres of gas leases in north central West Virginia, southwestern Pennsylvania, and eastern Ohio. Consol paid approximately $3.5 billion in cash for the acquisition and acquired approximately one million cubic feet of net crude reserves. Around the same time, Consol purchased all publicly owned stock in CNX Gas, a subsidiary of Consol. Knox/Consol drilled 534 wells in 2008, 247 wells in 2009, 317 wells in 2010, 254 wells in 2011, 96 wells in 2012, and 150 wells in 2013.

### III. 2012 NOAH HORN CONTRACT.

The primary focus of Gasco's motion was my exclusion of a contract between Knox/Consol and Noah Horn, entered into on December 19, 2011, that covered drilling in 2012, 2013, and 2014 ("2012 Noah Horn Contract"). The 2012 Noah Horn Contract was titled "Contract Purchase Order," renewed automatically unless a party gave timely notice of nonrenewal, and was not the result of competitive bidding.

On the third day of trial, Gasco sought to introduce the 2012 Noah Horn Contract in its case-in-chief during its direct examination of Shumaker. Gasco had not included the document on its exhibit list. Knox/Consol had not produced the 2012 Noah Horn Contract in discovery, and at trial, Knox/Consol's counsel indicated that they had not previously seen the document.

Gasco had issued a trial subpoena to Leon Boyd of Noah Horn that directed Boyd to bring to court all original drilling contracts between Noah Horn and Knox/Consol covering any portion of 2011. Counsel for Noah Horn had emailed the 2012 Noah Horn Contract to Gasco's counsel the week before trial began. Gasco's counsel represented that upon receiving the document, they initially thought it was a drilling contract, but they could not be sure because they had not received the attachments to the contract. They requested the attachments, which Boyd brought with him to court on the morning of the third day of trial. The

attachments consisted of a pricing sheet and a drilling bid proposal. Gasco's counsel made copies of the contract and its attachments and provided them to counsel for Knox/Consol that morning, and then sought to introduce the 2012 Noah Horn Contract that afternoon.

Outside the presence of the jury, Gasco argued that the 2012 Noah Horn Contract "impeaches Consol's narrative of the case because it refers to this drilling contract as a terms and conditions contract." Trial Tr., Dec. 14, 2016, at 53, ECF No. 422. Gasco's counsel noted that Shumaker had testified that terms and conditions contracts or contract purchase orders are not drilling contracts.

Knox/Consol's counsel objected to the introduction of the 2012 Noah Horn Contract based on their belief that they had not previously seen the document. Knox/Consol further argued that the subpoena that led to Gasco's receipt of the 2012 Noah Horn Contract had violated an order of the court that prohibited further discovery after September 1, 2016, and it objected on the ground that the document had not been included on Gasco's exhibit list. Shumaker stated that he was not familiar with the 2012 Noah Horn Contract. Because Shumaker could not authenticate the document, it was not admitted during his testimony.

Later that day, Gasco sought to call Boyd to introduce the 2012 Noah Horn Contract. Knox/Consol again objected on the same grounds and further argued

that the document was irrelevant because it was entered into more than six months after Fahrenhold sent the Addendum form to Rasnake.

Gasco contended that the 2012 Noah Horn Contract should not have surprised Knox/Consol because it was entered into and possessed by Knox/Consol, even if counsel had been unaware of it. Gasco stated that it had only issued the subpoena for documents to Boyd because Gasco's copy of the 2011 contract between Noah Horn and Knox/Consol was difficult to read, and it wanted to obtain a more legible copy. Gasco's counsel stated that he did not anticipate receiving any new documents in response to the subpoena. He stated that in an email exchange with Noah Horn's counsel regarding the subpoena, he had asked whether Boyd would have any information about the 2012 agreement between Knox/Consol and Noah Horn, specifically regarding whether it was an exclusive agreement. Noah Horn's counsel replied to the email by sending the 2012 Noah Horn Contract, which Gasco's counsel received about five days before the second trial began.

Upon reviewing the document, counsel for Gasco thought that it may have been a contract for ancillary services rather than a drilling contract. Gasco's counsel asked Noah Horn's counsel to provide the attachments to the contract. Noah Horn's counsel responded that Boyd would bring those documents to the trial that Monday, but counsel for Gasco at some point told Boyd his presence

would not be required until Wednesday. Gasco's counsel did not send the contract to counsel for Knox/Consol upon its receipt, despite an earlier-issued document request that required Gasco to produce copies of any documents received in response to third-party subpoenas.

Gasco argued that the document was responsive to a discovery request it had issued early in the case. However, Knox/Consol had objected to the discovery request in December 2013, and Gasco had never filed a motion to compel or otherwise followed up on the objection.

I ruled that the 2012 Noah Horn Contract would be excluded. I did so because I concluded that allowing Gasco to introduce the document or question witnesses about it would have been unfair to Knox/Consol, which would not have had an adequate opportunity to investigate the circumstances surrounding the contract.

The next day, during his cross-examination of Albert, Gasco's counsel began questioning the witness about the 2012 Noah Horn Contract. Knox/Consol objected on the grounds that allowing Gasco to ask questions about the 2012 Noah Horn Contract was simply a way to circumvent my ruling excluding the contract itself, and that allowing Gasco to use the contract in any way would undermine my pretrial order prohibiting further discovery. Counsel for Gasco responded that he was merely trying to impeach Albert's testimony and that Knox/Consol's

witnesses and counsel had opened the door by claiming that contract purchase orders are not drilling contracts.

I voiced my concerns about the limited relevance of the 2012 Noah Horn Contract. I noted that it did not counter Knox/Consol's evidence that the Addendum had been sent in error as part of an evergreening program, and there was no evidence that Gasco had been aware of the 2012 Noah Horn Contract, which had not even existed when the Addendum was executed. I also noted that Albert did not say unequivocally that a contract purchase order had never been used for a drilling contract or that a drilling contract had never been awarded without going through a bidding process; rather, he testified that he was unaware of any such case but did not know for certain. I stated that I was "really concerned about the fact that, you know, there really was no effort to obtain this document until past the disclosure time for exhibits," and Gasco "certainly knew what the issue was." Trial Tr., Dec. 15, 2016, at 71, ECF No. 424.

Gasco then proposed that it be permitted to call Boyd to testify as follows: "Number one, I have entered into a contract that wasn't bid; number two, it's called a a take or pay contract; number three, it's called a terms and conditions; and number four, it contains an evergreen provision." *Id.* Knox/Consol lodged an objection based on the best evidence rule and also contended that the proposed testimony would render my pretrial order and my exclusion of the contract itself

meaningless. Knox/Consol argued that if the 2012 Noah Horn Contract was relevant at all, its probative value was outweighed by the prejudice to Knox/Consol caused by its late disclosure. Knox/Consol asserted that "[t]he issue in this case is what was the practice at the time this addendum was sent," *id.* at 74, not the practice months later in December 2011. Counsel for Knox/Consol suggested that there may be an explanation for the 2012 Noah Horn Contract, but the witnesses who could offer that explanation were not present in court, and the person who had signed the contract was no longer employed by Knox/Consol.

I stated that the issue was a difficult one, but I again ruled to exclude the document and testimony regarding it. I found that the 2012 Noah Horn Contract did not relate to a material issue, and Gasco's failure to designate it as an exhibit in advance of trial rendered its introduction unfair to Knox/Consol. I directed counsel for Knox/Consol not to argue in closing that contract purchase orders were never used for drilling contracts.

On the fifth and final day of trial, I elaborated on my reasons for excluding the 2012 Noah Horn Contract as follows:

> The court ordered the parties to make pretrial disclosures under Rule 26(a)(3) of the Federal Rules of Civil Procedure by September 1, 2016. These proposed exhibits, which I have refused, were not disclosed at that time, and defense counsel has represented that it never knew of these exhibits until presented on the morning of the third day of trial, the trial, of course, to last five days.

It's also apparent from the representations of the attorneys that while the defendants objected to a question in an interrogatory by the plaintiffs asking for production of all drilling contracts, the defendants objected to that question, and the plaintiffs acquiesced in that objection and did not seek enforcement by the court of that request for production.

Rule 25(a)(3) disclosures do exclude from the terms of the rule exhibits introduced solely for impeachment purposes. But the exhibits in question have not, and were not intended solely for such impeachment. The exhibits involve the, a transaction on a later date than the addendum discussed and introduced in this case. And these exhibits do not directly impeach the testimony of any witnesses.

The proposed exhibits, in fact, are rebuttal to contention by the defendants of the basis for the mistaken sending of the addendum to Gasco. In addition, the relevancy of this evidence is slim since there's no evidence that Gasco knew of the transaction shown by the excluded exhibits, and Gasco's knowledge is a central issue in this case.

Trial Tr., Dec. 16, 2016, at 7-8, ECF No. 423.

In their post-trial briefs, the parties have pointed to additional details regarding discovery that are relevant to the issue of the 2012 Noah Horn Contract.

On January 3, 2013, while a motion to dismiss was pending, Gasco issued a subpoena to Noah Horn that commanded it to produce "[c]opies of all contracts for drilling services perfomred [sic] by Noah Horn Well Drilling or any parent[,] subsidiary, sister, or other related company for Consol, CNX, or Knox from January 1, 2008, through the present date." Mot. for Protective Order Ex. A, ECF No. 36-1. Counsel for Noah Horn emailed to counsel for Knox/Consol the documents it thought were responsive to the subpoena. Those documents included

the 2012 Noah Horn Contract at issue here. Thus, contrary to counsel's representation at trial, counsel for Knox/Consol had in fact seen the 2012 Noah Horn Contract before.

Noah Horn filed a Motion for Protective Order asking that the court either quash the subpoena altogether or enter an order requiring the documents to be designated for attorneys' eyes only. Conceding that the subpoena was premature, Gasco filed a motion seeking leave to conduct limited expedited discovery. In its motion, Gasco sought only the 2011 Noah Horn drilling contract. Following a hearing in which Gasco indicated it had withdrawn the subpoena to Noah Horn, I denied the Motion for Protective Order as moot and indicated that I would grant Gasco's motion for expedited discovery following the entry of a protective order. I entered a protective order on May 3, 2013, and directed Knox/Consol to produce to Gasco a copy of the 2011 drilling contract between Noah Horn and Knox/Consol.[3] Counsel for Knox/Consol later forgot about the 2012 Noah Horn Contract.

Gasco conducted a Rule 30(b)(6) deposition of Knox/Consol on June 13, 2014, two days before the close of discovery. Prior to the deposition, Gasco identified as a deposition topic all of Knox/Consol's drilling contracts entered into between June 1, 2010, and December 31, 2011. Albert served as the corporate designee for the deposition. In its brief, Knox/Consol asserts that it "searched its

---

[3] There are actually two such contracts, one for each of two drilling rigs, both executed on December 22, 2010.

files for responsive contracts in good-faith, including specifically for contracts with Noah Horn." Knox/Consol's Opp'n to Gasco's Mot. for New Trial 8, ECF No. 434. Apparently, that search did not uncover the 2012 Noah Horn Contract, though Knox/Consol has not provided any details regarding how or where it searched or why it did not locate the 2012 Noah Horn Contract.

During the deposition, Albert was asked to identify the drilling companies with whom Knox/Consol had entered into contracts during the stated time period. He identified Noah Horn as one such company. When asked how many of the contracts were with Noah Horn, he stated that there was one. Counsel for Gasco later asked whether Gasco had already been provided that contract, and Albert replied in the affirmative. Aside from those two brief mentions, there was no further questioning or discussion of Noah Horn during the corporate deposition.

Though Gasco knew that Noah Horn had performed drilling for Knox/Consol in 2012 based on the January 3, 2012, email from Clark to Chris Ratliff, counsel for Gasco never specifically asked about the agreement that governed that drilling. Gasco did not depose any representative of Noah Horn or issue a subpoena to Noah Horn after it withdrew its initial subpoena. Gasco did not specifically seek information about the 2012 Noah Horn Contract until after it issued its trial subpoena to Boyd, in advance of the second trial in this case, when it sent an email to counsel for Noah Horn asking whether Boyd had any

information about the 2012 drilling agreement between Knox/Consol and Noah Horn.

## IV. DISCUSSION.

The grant or denial of a motion for new trial is entrusted to the sound discretion of the district court. *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998). Pursuant to Federal Rule of Civil Procedure 59(a), I should grant a new trial if I am "'of the opinion that [1] the verdict is against the clear weight of the evidence, or [2] is based upon evidence which is false, or [3] will result in a miscarriage of justice.'" *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.,* 99 F.3d 587, 594 (4th Cir. 1996) (quoting *Aetna Cas. & Sur. Co. v. Yeatts,* 122 F.2d 350, 352-53 (4th Cir. 1941)). When considering a motion for new trial, I may "weigh the evidence and consider the credibility of witnesses." *Cline*, 144 F.3d at 301. Not every error warrants a new trial, for "[t]hough a person is entitled to a fair trial, he is not entitled to a perfect one. He does not have a right to a new trial merely because harmless error may have been committed." *Mills v. Mealey*, 274 F. Supp. 4, 7 (W.D. Va. 1967); *see* Fed. R. Civ. P. 61 (providing that "the court must disregard all errors and defects that do not affect any party's substantial rights.")

A.  2012 Noah Horn Contract.

Gasco makes three arguments respecting the 2012 Noah Horn Contract.
First, it contends that it is entitled to a new trial because Knox/Consol engaged in
misconduct under Rule 60(b)(3) by not identifying the contract in the Rule
30(b)(6) deposition of Albert.  Second, it argues that I should have allowed it to
use the 2012 Noah Horn Contract to impeach Shumaker's testimony.  Third, it
asserts that I erred in not admitting the 2012 Noah Horn Contract as substantive
evidence supporting its claim.

*1.  Misconduct.*

Federal Rule of Civil Procedure 60(b)(3) permits the court to order a new
trial if a party engages in fraud, misrepresentation, or other misconduct.  In order to
establish that a new trial is warranted, the moving party "must (1) have a
meritorious defense; (2) prove misconduct by clear and convincing evidence; and
(3) show that the misconduct prevented [it] from fully presenting [its] case."
*Tunnell v. Ford Motor Co.*, 245 F. App'x. 283, 288 (4th Cir. 2007) (unpublished).
If the moving party meets this burden, "[t]he court then balances the policy
favoring finality of judgments against the need to do justice to the moving party to
determine whether a new trial is appropriate."  *Id.*  Because the court of appeals
has already ruled that Gasco's claim was supported by sufficient evidence to be

submitted to a jury, I will focus my analysis on the second and third elements that Gasco must prove in order to obtain a new trial.

The Fourth Circuit has "granted Rule 60(b)(3) motions in cases in which one party failed to produce evidence essential to an adversary's position." *Richardson v. Boddie-Noell Enters., Inc.*, 78 F. App'x 883, 889 (4th Cir. 2003) (unpublished). "Where a party is able to fully prepare and present his case notwithstanding the adverse party's misconduct, the district court may deny relief under Rule 60(b)(3)." *Tunnell*, 245 F. App'x at 288. I find that Gasco has failed to prove misconduct by clear and convincing evidence, has failed to show that it was prevented from fully presenting its case, and in any event, has not convinced me that any injustice it may have suffered in relation to the 2012 Noah Horn Contract outweighs the policy favoring finality, particularly in light of the fact that this case has already been tried twice.

First, Gasco bears the burden on its motion, and it has failed to prove that Knox/Consol failed to produce any document it was required to produce. The 2012 Noah Horn Contract was technically responsive to the corporate deposition topic identified by Gasco in that the topic covered documents entered into between June 1, 2010, and December 31, 2011, and the 2012 Noah Horn Contract was executed on December 19, 2011. However, the 2012 Noah Horn Contract covered drilling in 2012, 2013, and 2014, so it is understandable that Albert did not think of

that contract when asked to discuss Knox/Consol's 2010 and 2011 drilling contracts. This is especially true considering that throughout the case, Gasco had repeatedly indicated that it was only interested in the *2011* drilling contract between Knox/Consol and Noah Horn. Despite Gasco's clear knowledge that Noah Horn was performing drilling for Knox/Consol in 2012, Gasco made no real attempt to discover the details of that arrangement. It did not question Albert or any other witness about the arrangement, and it did not seek to depose any representative of Noah Horn. It issued no interrogatory or document request specifically regarding Knox/Consol's agreement with Noah Horn for drilling during 2012. Gasco's counsel apparently did not ask anyone for any details about that agreement until he emailed Noah Horn's counsel in December 2016, well after the close of discovery and shortly before trial.

In short, Gasco gave Knox/Consol every indication that the 2012 agreement was unimportant to its case. The fact that Knox/Consol's counsel forgot about the 2012 Noah Horn Contract and did not come across it while preparing discovery responses certainly does not reflect well on Knox/Consol's counsel. But Gasco's counsel had its own duty to be thorough in its investigation of the facts during discovery, and it cannot secure a new trial based on its lack of knowledge of an agreement that it failed to seek in any real way despite having information that should have led to the realization that some agreement existed.

More importantly, the 2012 Noah Horn Contract was not essential to Gasco's litigation position. As the court of appeals noted, and as Gasco itself has argued, the key issue in this case is whether Knox/Consol's words and actions, and other circumstances *known to Gasco*, warranted Gasco believing, *in May and June of 2011*, that Knox/Consol intended to revive the expired 2008 Drilling Contract. The 2012 Noah Horn Contract does not speak to that issue, as it was not executed until six months later, and it is undisputed that Ben Ratliff was unaware of its existence at any point prior to trial. I therefore stand by my previous conclusion that the 2012 Noah Horn Contract was of minimal relevance to Gasco's claim.

Gasco contends that the 2012 Noah Horn Contract shows that Knox/Consol intended to renew the 2008 Drilling Contract and did not send the Addendum by mistake. I disagree. The 2012 Noah Horn Contract, though called a Contract Purchase Order and negotiated without a bidding process, was not created using the Addendum form and was not a take-or-pay contract. It gave Noah Horn exclusive drilling rights in Tennessee and Virginia, a provision which would have made no sense had Knox/Consol believed it had already entered into a take-or-pay contract with Gasco for the same territory. If anything, introduction of the 2012 Noah Horn Contract would have strengthened Knox/Consol's position that it had made a mistake in sending the Addendum.

Gasco relies heavily on *Schultz v. Butcher*, 24 F.3d 626 (4th Cir. 1994). In *Schultz*, the court of appeals held "that an adverse party's failure, either inadvertent or intentional, to produce such obviously pertinent requested discovery material in its possession is misconduct under the meaning of Rule 60(b)(3)." *Id.* at 630. The court went on to hold "that new evidence does not have to be result altering to warrant a new trial on a Rule 60(b)(3) motion." *Id.* at 631.

This case is readily distinguishable from *Schultz*. There, the withheld document spoke directly to whether the defendant had been negligent, which was the primary issue in the case. In contrast, the 2012 Noah Horn Contract is of tangential relevance at best. While a withheld document need not be result-altering to trigger a new trial, it must be relevant. *See* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). Moreover, evidence that is only minimally relevant should be excluded if it is likely to, inter alia, confuse the issues, create undue delay, or waste time. *See* Fed. R. Evid. 403. The introduction of the 2012 Noah Horn Contract would have done just that.

I also continue to believe that Knox/Consol's counsel was unfairly surprised by this document on the third day of trial. Counsel for Gasco should have immediately forwarded the 2012 Noah Horn Contract to counsel for Knox/Consol upon its receipt. There was no legitimate reason for Gasco's counsel to undertake further investigation and wait to receive the attachments before even mentioning

the contract to Knox/Consol's counsel. Gasco was obligated by a discovery request to produce any documents received in response to a third-party subpoena, whether relevant or not. Given that trial was scheduled to begin the following week, Gasco should have complied with that obligation promptly. The timing of Gasco's disclosure of the 2012 Noah Horn Contract to Knox/Consol gives the impression of a strategic maneuver rather than a good-faith effort to play by the rules.

Gasco has not met its heavy burden of proving misconduct by clear and convincing evidence or of proving that it was prevented from fully presenting its case. This case has now been tried twice. Both trials ended with the conclusion, first by me and second by a jury, that Gasco had not proved mutual assent. Given the overwhelming evidence that Knox/Consol made a mistake and that Gasco knew or should have known of the mistake, I cannot conclude that the 2012 Noah Horn Contract would have tipped the scales even slightly in Gasco's favor. Any trivial prejudice that Gasco may have suffered by Knox/Consol's failure to mention the 2012 Noah Horn Contract in its 30(b)(6) deposition is well outweighed by the important interest in litigation finality, and I decline to set aside the jury's verdict.

*2.  Impeachment.*

Gasco contends that Knox/Consol falsely told the jury, through its testimony and argument, that it did not use contract purchase orders for drilling contracts and that it did not enter into drilling contracts without first soliciting bids.  Gasco argues that it should have been allowed to use the 2012 Noah Horn Contract as impeachment evidence to counter these assertions.

At trial, Knox/Consol did make a distinction between drilling contracts and the non-obligatory contract purchase orders that were meant to be amended by the Addendum.  But the fact remains that the 2012 Noah Horn Contract was executed six months after the Addendum.  It does not bear upon Knox/Consol's practices at the time the Addendum was executed, and it therefore cannot impeach any testimony regarding those practices.

Moreover, no witness testified that Knox/Consol had never entered into a drilling contract that was called a Contract Purchase Order, contained a Terms and Conditions section, contained an automatic renewal provision, or was otherwise similar to the 2008 Drilling Contract and Addendum.  Thus, the 2012 Noah Horn Contract would not have impeached any witness's testimony.  While some of Knox/Consol's comments during its opening statement may have implied that contract purchase orders were never used for drilling contracts or that drilling contracts were always products of competitive bidding, the jury was instructed that

statements by the lawyers are not evidence. And Knox/Consol's point was that Ben Ratliff knew when he received the Addendum that it was unlike any process by which Gasco had ever entered into any previous drilling contract with Knox/Consol, which should have alerted him to Knox/Consol's mistake. Nothing about the 2012 Noah Horn Contract impeaches that narrative.

Even if the 2012 Noah Horn Contract and proposed related testimony did serve to impeach the testimony of Knox/Consol's witnesses, it still would have been subject to the Rule 403 balancing test. *See Carnell Constr. Corp. v. Danville Redevelopment & Hous. Auth*, 745 F.3d 703, 719-20 (4th Cir. 2014). As noted above, any probative value of the proposed evidence was outweighed by its unfair prejudice to Knox/Consol as well as its tendency to confuse the issues and waste time. I find no error in my exclusion of this evidence for impeachment purposes.

*3. Substantive Evidence.*

Gasco further argues that it should have been permitted to introduce the 2012 Noah Horn Contract as substantive evidence showing that Knox/Consol did not make a mistake in sending the Addendum, despite its failure to identify the evidence in its pretrial disclosures. *See* Fed. R. Civ. P. 26(a)(3)(A) (requiring parties to disclose, at least 30 days before trial, certain information about "the evidence that it may present at trial other than solely for impeachment"); Fed. R. Civ. P. 37 (prohibiting a party from using information or witness not disclosed in

accordance with Rule 26(a) unless failure to disclose was substantially justified or harmless).

The Fourth Circuit has instructed that

in exercising its broad discretion to determine whether a nondisclosure of evidence is substantially justified or harmless for purposes of a Rule 37(c)(1) exclusion analysis, a district court should be guided by the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003).

I considered these factors during the trial and I have considered them again here. Gasco's argument fails for the same reasons stated above. The evidence was of limited relevance, and its probative value was outweighed by its unfair surprise to Knox/Consol's counsel and its potential to create undue delay. Gasco was not justified in waiting until the third day of trial to disclose to Knox/Consol a document that it had received a week earlier pursuant to a subpoena. As I told counsel when the issue first came to light, on the third day of a trial that was scheduled for only five days, we did not have the luxury of recessing the trial to allow Knox/Consol's counsel to investigate the facts surrounding the 2012 Noah Horn Contract and secure witnesses to testify about it. In addition to the

constraints of the court calendar, I am mindful of the burden a trial places on jurors, and extending the length of the jurors' service to allow a full exploration of this minimally relevant evidence was not justified.

The 2012 Noah Horn Contract does not supply any adequate reason to disturb the jury's verdict. I continue to find that the contract and evidence regarding it were properly excluded. I will not grant Gasco a third trial for the purpose of presenting this evidence.

### B. Jury Instruction Regarding Mutual Assent.

Gasco next argues that it is entitled to a new trial because of errors in the jury instructions. Specifically, Gasco contends that my instructions improperly led the jury to consider Knox/Consol's subjective state of mind in determining whether Gasco had proved mutual assent. Gasco also asserts that certain language drawn from the court of appeals' opinion in this case and included in the jury instructions was legally erroneous and unsupported by Virginia law.

"The test of the adequacy of jury instructions is whether the jury charge, construed as a whole, adequately states the controlling legal principle without misleading or confusing the jury." *Chaudhry v. Gallerizzo*, 174 F.3d 394, 408 (4th Cir. 1999). As the Fourth Circuit has noted,

> It is easy enough to pick at words, phrases, and sentences in a charge, but that overlooks the fact that the charge in its totality was what the jury heard. A jury verdict, moreover, represents a good deal of work

on the part of a good many people, and the instructions undergirding that collective effort should not succumb lightly to semantic fencing.

*Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011) (affirming denial of motion for new trial based on allegedly incorrect jury instructions). District courts have great discretion in selecting appropriate jury instructions, *see Hardin v. Ski Venture, Inc.,* 50 F.3d 1291, 1293 (4th Cir. 1995), and a party challenging a jury instruction faces "a heavy burden." *Noel*, 641 F.3d at 586. Even if a jury instruction is found to be flawed, the error must seriously prejudice the plaintiff's case before a defense verdict can be overturned. *Hardin*, 50 F.3d at 1296.

Under Virginia law,[4] for a legally enforceable contract to exist, "there must be mutual assent of the contracting parties to terms reasonably certain under the circumstances." *Allen v. Aetna Cas. & Sur. Co.*, 281 S.E.2d 818, 820 (Va. 1981). Mutual assent is an objective standard that "imputes to a person an intention corresponding to the reasonable meaning of his words and acts." *Lucy v. Zehmer*, 84 S.E.2d 516, 521 (Va. 1954) (internal quotation marks and citation omitted). If a contracting party's "words and acts, judged by a reasonable standard, manifest an intention to agree, it is immaterial what may be the real but unexpressed state of his mind." *Id.* at 522. Stated differently, a contracting party may not assert

---

[4] In a diversity case, I must apply the conflict of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). The 2008 Drilling Contract states that the governing law would be "the state where work is performed" (Gasco Trial Ex. 2 § 18, ECF No. 387-2), although the work was to be performed in different states. The parties, however, have contended throughout this case that Virginia law applies.

another intention "when his conduct and words would warrant a reasonable person in believing that he intended a real agreement." *Id.*

Gasco's complaints center on the following jury instruction:

> For a contract to exist, the minds of the parties must have met on every material term of the alleged agreement. Whether the minds have met is a question of intention. For there to be an agreement, the parties must have a distinct intent common to both and without doubt or difference. Because the offer and acceptance may be by word, act, or conduct, a meeting of the minds may be shown by direct evidence of intent or by indirect evidence of facts which imply an intent. If a party's words or actions warrant a reasonable person in believing that it intended a real agreement, its contrary, but unexpressed, state of mind is immaterial.
>
> A party cannot snap up an offer that is too good to be true. If either party knew or should have known that the other had made a mistake with respect to the alleged agreement, then there was no meeting of the minds, and no contract.

Jury Instr. No. 11, ECF No. 408. Gasco also complains about the mutual assent question on the jury form, which referenced a "meeting of the minds" and asked whether there was "a distinct and common intent and understanding by both parties as to all of [the contract's] material terms." Verdict Form, ECF No. 409. I find that the jury instructions and verdict form accurately summarized the applicable law.

Gasco contends that I failed to instruct the jury that mutual assent must be evaluated objectively. To the contrary, my instruction did just that. The instruction speaks of a party's "word, act, or conduct" evidencing its intent to enter

into an agreement. Jury Instr. No. 11, ECF No. 408. It then reads, "If a party's words or actions warrant a reasonable person in believing that it intended a real agreement, its contrary, but unexpressed, state of mind is immaterial." *Id.* The jury was thus instructed that it must evaluate Knox/Consol's outward manifestations — its words and actions — from the viewpoint of a reasonable person. The Fourth Circuit expressly approved of the first paragraph's final sentence, stating that the language conveyed to the jury "that its decision on mutual assent must rest on the objective circumstances." *Knox Energy*, 637 F. App'x at 740.

Gasco argues that I erred in using the phrase "meeting of the minds," which it claims implies subjective intent. But Gasco's own proposed instructions stated that "the minds of the parties must have met on every material term of the alleged agreement," and "[w]hether the minds of the parties have met is a question of intention." Gasco's Proposed Jury Instrs. & Special Interrogs. Nos. 16, 17, ECF No. 334. Gasco cannot credibly seek a new trial based on language that it proposed. Furthermore, the meeting of the minds concept appears throughout Virginia contract law and was embraced by the Supreme Court of Virginia as recently as this year. *See Funny Guy, LLC v. Lecego, LLC*, 795 S.E.2d 887, 900 (Va. 2017); *see also Spectra-4, LLP v. Uniwest Commercial Realty, Inc.*, 772

S.E.2d 290, 295 (Va. 2015); *Moorman ex rel Moorman v. Blackstock, Inc.*, 661 S.E.2d 404, 409 (Va. 2008).

Gasco assails the "distinct intent common to both" language used in the instruction and similar language used in the verdict form, but that language is likewise drawn from the governing case law. "Until the parties have a distinct intention common to both and without doubt or difference, there is a lack of mutual assent and, therefore, no contract." *Phillips v. Mazyck*, 643 S.E.2d 172, 175 (Va. 2007) (citation omitted).

Gasco also complains about the last paragraph of Instruction 11 and contends that this language, which comes from the opinion of the court of appeals in this case, is erroneous dicta that I should not follow. *Knox Energy*, 637 F. App'x at 738 ("If Gasco knew or should have known that Consol made a mistake, . . . there was no mutual assent."). To the contrary, I find that I am bound by the holding of the court of appeals. Moreover, in its opening statement Gasco told the jury that a key issue in this case was whether "Gasco knew or should have known about the mistake." Trial Tr., Dec. 12, 2016, at 35, ECF No. 419. Once again, Gasco cannot secure a new trial based on a concept that it introduced. As for the "snap up" language in the last paragraph of Instruction 11, it accurately reflects the basic premise of this case even if it uses a colloquial phrase. Viewed alongside the

next sentence, the meaning of the language was clear — the law does not permit Gasco to take advantage of a mistake of which it knew or should have known.

Gasco's theory of its case from the beginning has been that the only relevant evidence consists of the emails between Fahrenhold, Bywaters, and Rasnake and the signed Addendum and accompanying documents. Gasco has repeatedly argued that the case should be decided exclusively on the express communications between the parties at the time the Addendum was executed. Gasco contends that Shumaker's signature on the Addendum makes this an open-and-shut case, and neither party's knowledge or intent matters. But that view of the case has been repeatedly rejected as inconsistent with governing law, and I again decline to adopt Gasco's position. The jury properly considered all of the circumstances surrounding the transmission and execution of the Addendum, including evidence about the parties' prior dealings, the state of the market, and Ben Ratliff's extensive communications with his counsel about the addendum. Based on all of the evidence, the jury concluded that a reasonable person in Ben Ratliff's position would have known that Knox/Consol had made a mistake in sending the Addendum and never intended to revive the 2008 Drilling Contract. Nothing in the jury instructions or verdict form erroneously led the jurors to that conclusion. I find that the jury instructions and verdict form, viewed as a whole, properly summarized the applicable law, and Gasco is not entitled to a new trial.

C.  Verdict Contrary to Clear Weight of the Evidence.

Finally, Gasco seeks a new trial on the ground that the jury's verdict is against the clear weight of the evidence.  Gasco's argument is that the executed Addendum establishes mutual assent as a matter of law.

Rule 59(a)(1)(A) provides for the grant of a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." The Fourth Circuit has held that a new trial may be granted if "the verdict is against the clear weight of the evidence." *Atlas Food Sys. & Servs., Inc.*, 99 F.3d at 594.  The standard for obtaining a new trial is a "very high standard." *Columbia Commc'ns Corp. v. EchoStar Satellite Corp.*, 2 F. App'x 360, 368 (4th Cir. 2001) (unpublished).  "Factual inquiries are the key to examining whether the verdict is against the clear weight of the evidence." *Miller v. Pilgrim's Pride Corp.,* No. 5:05CV00064, 2008 WL 178473, at *2 (W.D. Va. Jan. 16, 2008).

I find that there was ample evidentiary support for the jury's conclusion that Gasco failed to meet its burden of proving mutual assent.  The language of the Addendum itself, as well as the emails from Fahrenhold and Bywaters, indicated that the Addendum form was intended to extend the term of a contract purchase order that was currently in effect in June 2011.  The undisputed evidence showed that the 2008 Drilling Contract had expired almost a year earlier.  The jury could reasonably have concluded that Knox/Consol's express communications to Gasco

at the time of the Addendum's transmission and execution objectively demonstrated a lack of intent to revive the 2008 Drilling Contract.

In addition, the other evidence presented at trial strongly supports the jury's verdict. Ben Ratliff knew that the 2008 Drilling Contract, with its take-or-pay provision, was highly unusual; he had only ever negotiated one other contract with a 328 take-or-pay provision, and that contract had also been executed in mid-2008. At the time he received the Addendum form from Fahrenhold, Ben Ratliff knew that the natural gas market had plummeted. Six months earlier, he had submitted bids that were far less favorable to Gasco than the 2008 Drilling Contract, and Knox/Consol had rejected those bids. Drilling rigs were readily available to companies like Knox/Consol in the geographic region that had been covered by the 2008 Drilling Contract, as evidenced by the fact that 15 of Gasco's 16 operable rigs were idle at the time. Knox/Consol expressly told Gasco in January 2011 that it would only be drilling a small number of wells that year and that Noah Horn would be performing all of the drilling.

Gasco's previous drilling contracts with Knox/Consol had been the product of bidding and negotiations, yet the Addendum form was sent to Gasco by a person with whom Ben Ratliff had not previously interacted, and with little explanation. Ben Ratliff's behavior regarding the Addendum implied that he understood that Knox/Consol had sent the Addendum mistakenly and that he sought to avoid

alerting Knox/Consol to its mistake. Though he did not normally seek his attorney's advice before entering into contracts, he consulted his attorney on the day he received the Addendum form and repeatedly thereafter. He signed the electronic commerce agreement and then waited three days before signing the Addendum. He instructed Rasnake to send a rather cryptic email to Fahrenhold that did not expressly mention drilling. Although he had sent monthly invoices at Knox/Consol's request when the 2008 Drilling Contract had been in effect, he did not send monthly invoices under the Addendum and instead waited until the deadline for notice of nonrenewal had passed to send an invoice for an entire year of standby time, despite the fact that waiting to send the invoice was financially disadvantageous to Gasco. He did not contact Knox/Consol to obtain a purchase order for the invoice before submitting it, as Gasco had done for all previous invoices under the 2008 Drilling Contract. He consulted his attorney about the Addendum when he was preparing to submit a bid to Knox/Consol for drilling in the Marcellus Shale, and he then added atypical language to the bid protecting any other contracts Gasco might have had with Knox/Consol while omitting any express mention of the Addendum.

Ben Ratliff had a close working relationship with Albert, Wright, and others at Knox/Consol, yet he never mentioned the Addendum to them. He did not tell Gasco's Vice President of Drilling about the Addendum, nor did he ever mention it

to Gasco's other executives or shareholders. It was unusual for Gasco's accountant to be involved in invoicing, but Ben Ratliff involved an accountant in preparing the invoice that he sent to Knox/Consol based on the Addendum. The accountant participated in meetings with Gasco's attorney regarding the Addendum.

Despite Ben Ratliff's testimony that he believed Knox/Consol intended to revive the 2008 Drilling Contract with the Addendum, he simply was not a credible witness. The weight of the evidence supports the jury's verdict that based on the objective circumstances known to Gasco in June 2011, a reasonable person would not have believed that Knox/Consol intended to reinstate the 2008 Drilling Contract. Gasco is not entitled to a new trial.

## V. CONCLUSION.

Gasco has now had two opportunities to present its case. Despite its complaints, I find that none of my evidentiary rulings or statements to the jury deprived Gasco of a fair trial. The jury reached the same conclusion that I reached in granting judgment as a matter of law in the first trial. The weight of the evidence plainly supports the jury's conclusion that Gasco failed to prove mutual assent to revive the 2008 Drilling Contract.

For the foregoing reasons, it is **ORDERED** that the Motion for New Trial, ECF No. 429, is DENIED. A separate judgment will be entered in accordance with the jury's verdict.

ENTER:  June 28, 2017

/s/  James P. Jones
United States District Judge